**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marshall Gross, | No. CV-18-02103-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| CitiMortgage Incorporated, | |
| Defendant. | |

Plaintiff Marshall Gross ("Gross" or "Plaintiff") bought a property in 2007 with two loans, a larger senior loan and a smaller junior loan. Defendant CitiMortgage Incorporated ("CitiMortgage" or "Defendant") later acquired the junior loan. Gross stopped making payments on both loans in 2012, and in 2013 the senior lender sold Gross' property at a trustee's sale. CitiMortgage continued to report the outstanding debt of the junior loan on Gross' credit report. Gross filed suit, claiming the Arizona anti-deficiency statute extinguished the debt and CitiMortgage therefore violated the Fair Credit Reporting Act when it failed to conduct a reasonable investigation following his written credit reporting dispute and when it willfully provided inaccurate information to credit reporting agencies. The parties have now filed cross-motions for summary judgment. Gross' motion will be denied and CitiMortgage's motion will be granted.

## BACKGROUND

The following facts are undisputed. The parties each filed separate statements of facts, as required by Local Rule of Civil Procedure 56.1(a), to accompany their motions

for summary judgment. (Docs. 123 (CitiMortgage) and 126 (Gross).) Any party opposing a motion for summary judgment must file a controverting statement of facts setting forth, "for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed," as well as "any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party." LRCiv 56.1(b). "No reply statement of facts may be filed." LRCiv 56.1(b). The deadline for a controverting statement of facts is 30 days after service of the original motion for summary judgment and statement of facts. LRCiv 56.1(d).

The cross-motions were filed on December 16, 2019. Therefore, responses to the motions and controverting statements of fact were due on January 15, 2020. Each party timely responded to the other's motion for summary judgment (Docs. 127, 128), but only CitiMortgage filed a controverting statement of facts. (Doc. 129.) On January 30, 2020, each party timely replied in support of its own motion for summary judgment (Docs. 130, 132), and Gross filed a document titled "Plaintiff's Controverting Statement of Facts" with the statement "Pursuant to Local Rule 56.1(b), Plaintiff submits this Controverting Statement of Facts supporting its Reply to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment as well as Plaintiff's Response to Defendant's Motion for Summary Judgment previously filed." (Doc. 131.) CitiMortgage filed a motion to strike this document, pursuant to Local Rule 7.2(m)(1), as a reply statement of facts; *i.e.*, a filing that is explicitly prohibited by Local Rule 56.1(b). (Doc. 133.) Gross admits that a statement of facts cannot be filed with a reply brief, argues "at its core" his document objects to CitiMortgage's statement of facts, and "concedes that these objections should have been filed with Plaintiff's Response in Opposition to Summary Judgment." (Doc. 134.)

Gross' controverting statement of facts was filed as a reply statement of facts, a category of filing that is prohibited by the local rules. Gross requests that, as an alternative

to being stricken, the controverting statement of facts be "refile[d] . . . in the proper spot." (Doc. 134 at 3.) The Court will consider the untimely controverting facts (¶¶ 1–44), because CitiMortgage is not prejudiced by those facts, which largely repeat Gross' own statement of facts and dispute CitiMortgage's characterization of exhibits. However, CitiMortgage's Motion to Strike is granted as to ¶¶ 45–49, which constitute the prohibited reply statement of facts. Where the parties' statements of fact differ in the characterizations of exhibits, the Court considers the exhibits alone, drawing the appropriate inferences in favor of the non-moving party.

On or about January 29, 2007, Gross purchased a single-family home in Queen Creek, Arizona (the "Property"). (Doc. 68 at 2, Doc. 123 at 1, Doc. 126 at 1.) The parties do not dispute that the Property is a "trust property of two and one-half acres or less which is limited to and utilized for either a single one-family or a single two-family dwelling." A.R.S. § 33-814(G). Gross purchased the Property with "an 80-20 loan"—more specifically, a senior lien of $161,896 and a junior lien of $40,474. (Doc. 123 at 1, Doc. 126 at 1, Doc. 126-5 at 41.) The $40,474 junior lien ("Second Loan" or "debt") was originally owned by IndyMac Bank, F.S.B., and later assigned to CitiMortgage. (Doc. 123 at 1.) In March 2009, CitiMortgage verified it was in the second lien position, while the senior lien, for $161,896, was held by IndyMac Bank. (Doc. 126-5 at 41.)

Gross began experiencing financial difficulties, and made no payments on the debt after November 2012. (Doc. 123 at 1, Doc. 126 at 2, Doc. 126-5 at 25.) On March 29, 2013, CitiMortgage received notice the senior lender would be selling the Property to a third party pursuant to the trustee's power of sale (the "Trustee Sale"), and noted "there [wa]s no equity left on this property" at the time. (Doc. 126-5 at 38–39.) The Property was sold for $161,400 at the Trustee Sale on June 13, 2013. (Doc. 123 at 2, Doc. 123-7 at 19.) Gross' credit report indicated a foreclosure had occurred in or around July 2013. (Doc. 126 at 2.) CitiMortgage's records regularly confirm the debt is in the "second lien position," but are somewhat inconsistent when describing the senior lien (which appears to have been re-sold even after the foreclosure). For example, despite being aware in March 2013 of the

scheduled June 2013 Trustee Sale, on September 18, 2015 CitiMortgage noted "There is no indication of [the] senior lien [having] been in foreclosure" and noted the senior lien, for $161,896, was held by OneWest Bank. (Doc. 126-5 at 27, 37–39.) On October 21, 2015, a member of the loss management team recommended the debt be charged off[1] because there was no equity and the loan was "over 180 days delinquent," and wrote "The SR Lien is with OneWest Bank and no indication that Sr Lien in foreclosure." (Doc. 126-5 at 25.) But on May 31, 2016 CitiMortgage noted "Cease Collections & Property Preservation, Senior Lien Foreclosure Sale Completed," and on September 30, 2016 CitiMortgage noted "Property is under different borrower name as per Realquest." (Doc, 126-5 at 15, 18.) On January 17, 2017, and again on August 30, 2017, CitiMortgage noted both "The Sr. Lien [is] in complete foreclosure as per Realquest" and "Sr. Lien is CIT Bank NA . . . in the amount of $161896," statements which appear somewhat contradictory. (Doc. 126-5 at 6, 10.)

In or around September 2017, Gross tried to get pre-approved to purchase a home, but was denied a mortgage. (Doc. 126 at 2.) On October 23, 2017 and November 3, 2017, Gross called CitiMortgage and spoke with representatives to argue "he did not owe Citi any money post foreclosure." (Doc. 126 at 3.) The CitiMortgage representatives noted that Gross was "disputing [foreclosure] of the prop[erty]" and informed him that his account was in pre-foreclosure but not foreclosure "on [CitiMortgage's] end," while the "other lien was alread[y] [foreclosed] on." (Doc. 126-5 at 4-5.)

On February 23, 2018, Gross sent a written dispute to TransUnion, which transmitted an Automated Credit Dispute Verification ("ACDV") to CitiMortgage with the dispute code "112: Consumer states inaccurate information" and, in the section for "FCRA Relevant Information," a note reading "House was foreclosed on in 2013[.] House meets the criteria for Arizona anti[-]deficiency statu[t]es ARS 33 729[.] Should not be held liable for debt after foreclosure[.] Times Disputed In Last 120 Days 0[.]" (Doc. 126 at 4, Doc.

---

[1] To "charge off" means to "treat (an account receivable) as a loss or expense because payment is unlikely." Black's Law Dictionary 249 (8th ed. 2004). A charge off is a "major derogatory" item under the FICO scoring model, which lowers a credit score. (Doc. 126 at 6.)

126-6 at 2.) CitiMortgage responded the same day, noting a current balance of $38,010 and a past due amount of $50,739, noting that the account status was 180 days or more past due, and adding in the CCC[2] field the note "XB: Account information disputed by consumer under the Fair Credit Reporting Act." (Doc. 126-6 at 3.)

From December 2013 to April 2, 2018, the debt allegedly owed to CitiMortgage was "saved" from charge off due to the Servicemembers Civil Relief Act ("SCRA"). (*See* Doc. 126-5 at 2–29, 36–37.) The SCRA prohibits the "sale, foreclosure, or seizure of property for a breach of an obligation . . . during, or within one year after, the period of the servicemember's military service" unless a court orders it or the servicemember waives the rights. 50 U.S.C. § 3953. Gross enlisted in the Army Reserves in April 2009, was deployed from June 2015 to June 2016, and was still in the military as of June 2019. (Doc. 126-1 at 7–9.) It is not clear why the SCRA did not prevent the foreclosure on the senior lien, but that mystery does not bear on the present case. Nor is there any explanation for how CitiMortgage determined Gross' SCRA protection ended on April 2, 2018, but it appears CitiMortgage postponed charging off Gross' debt in at least 28 separate months because of the SCRA.[3]

---

[2] "A Compliance Condition Code ("CCC") … 'allows the reporting of a condition that is required for legal compliance according to the Fair Credit Reporting Act or the Fair Credit Billing Act.'" (Doc. 123-8 at 12.)

[3] On December 30, 2013, CitiMortgage noted "Account saved from December Charge Off due to SCRA," and in 2014 the account was "saved from May Charge Off due to SCRA," "saved from June Charge Off due to SCRA," and "saved from [August] Charge Off due to SCRA." (Doc. 126-5 at 36–37.) In 2015, the notations became much more frequent: "AC6 . . . Soldier\Sailor SCRA" (January); "Account is in AC6 – SCRA" (March); "Exception from c/o – CC AC6 SCRA" (May); "exception from charge off due to SCRA good till 4/2/18" (June); "SAVE-from charge off due to SCRA-A6" (July); "saved from end of month charged off . . . AC6 . . . Soldier\Sailor SCRA" (August); and "saved charged off . . . AC6/Soldier& Sailor (SCRA)" (September). (Doc. 126-5 at 27, 29.) On October 19, 2015, CitiMortgage noted again "Exception from charge off SCRA – AC6." (Doc. 126-5 at 27.) The following day, October 20, 2015, a member of CitiMortgage's pre-foreclosure team contacted "DRL Charge Offs" and stated Gross' "account[] need[s] to be charged-off as [it] resulted in 'NO EQUITY'." (Doc. 126-5 at 26. On October 21, 2015, a charge-off review was conducted, and the account was "[r]ecommended for charge-off." (Doc. 126-5 at 25.) On November 2, 2015, CitiMortgage noted "Account not charged off as it is SCRA protected." (Doc. 126-5 at 24.) The account was saved from charge off again in November and December 2015; and in January (with the note "Protection until 4/2/2017"), February, March, May, June, July (with the note "File has to continue/remain on hold with PF938 as borrower found active duty as per DMDC site and foreclosure protection end date found in future, 04/02/2018"), August, September, October (with the note "Loan under mandatory charge off, Sol[di]er/sailor SCRA protected through 4-2-18 per Citilink. Please

- 5 -

On April 19, 2018, 17 days after the SCRA protection expired, CitiMortgage approved a charge off of the debt and noted the senior lienholder had foreclosed on June 27, 2013 for $161,400. (Doc. 126-5 at 2.) In May 2018, Gross filed written disputes with the three credit reporting agencies ("CRAs") (Experian, Equifax, and TransUnion). (Doc. 126 at 4.) In the letters, Gross stated "I don't owe any money on this loan. The house was foreclosed on June 13, 2013." (Doc. 126 at 5.) The CRAs forwarded Gross' dispute to CitiMortgage, as required under 15 U.S.C. § 1681i(a)(2). (Doc. 68 at 3.) CitiMortgage changed the tradeline[4] to a $0 balance as of May 2018 and closed the account, with $38,010 charged off as of April and May 2018. (Doc. 126 at 5.) CitiMortgage continued to report that the monthly payments had been due, and were 180 days late, from August 2013 through March 2018. (Doc. 126 at 5.)

Gross states, and CitiMortgage does not dispute, that the charge off was "[i]n response to the May 2018 dispute." (Doc. 126 at 5, ¶ 26; Doc. 129 at 3, ¶ 26.) The Court notes, however, that CitiMortgage repeatedly tried to charge off the debt earlier but was prevented from doing so by the SCRA. CitiMortgage's motive for charging off the debt does not bear on any of the ultimate legal issues, but it appears the charge off ultimately occurred once the SCRA no longer applied. That is, the charge off was not *solely* in response to Gross' May 2018 dispute. (Doc. 126-5 at 2.)

To investigate Gross' February and May 2018 disputes, CitiMortgage dispute agents "look[ed] at the transaction history[,] . . . prior case notes, and . . . the system notes." (Doc.

---

update AF30 to prevent charge off."), November (with the note "Account not able to [be] charged off as borrower is in active military duty"), and December 2016. (Doc. 126-5 at 14–21.) The account was also saved from charge off in January, May (with the note "PreFc SCRA"), and September 2017. (Doc. 126-5 at 5–10.) This provides context for the notes CitiMortgage took on Gross' October 23, 2017 phone call ("cust[omer] disputing f/c of the prop. [I] provided the scra contact n[u]mb[e]r") and his November 3, 2017 phone call ("Agent is asking if client is responsible for the account due to scra, advised yes, account is still active," with the additional note "trans to scra line to discuss ncbr"). (Doc. 126-5 at 5.) On April 19, 2018, CitiMortgage noted "There has been a 4% increase in value from O/A to Ext BPO. Customer was protected by SCRA until 4/2/18. Review of the account shows per the CBR and RQ, the 1st lienholder CIT Bank f/c 6/27/13 for $161,400. Charge off approved." (Doc. 126-5 at 2.)

[4] The Court has previously defined "tradeline" as "Credit account records that are provided to credit reporting organizations. A trade line, also spelled as tradeline, can include a mortgage, line of credit, credit card, or any other credit-related item that is provided by a financial institution or lender." (Doc. 94 at 2.)

126-2 at 96–98 (95:22–97:8).) In order to verify or validate the debt, CitiMortgage "review[ed] the note, ma[d]e sure [CitiMortgage] had a signed note by [Gross] on [the] system to confirm that [Gross] truly did sign for that debt[,] . . . compare[d the promissory note] to the name on the system and then compare[d] the original loan amount, ma[d]e sure everything matched up, and then . . . look[ed] through the . . . transaction history." (Doc. 126-2 at 127–128 (126:5–127:2).) After Gross filed his disputes, and CitiMortgage conducted its investigation, CitiMortgage "changed the middle name" because the credit report originally had Gross' "full middle name" which was "updated . . . to just the middle initial . . . based off of the note." (Doc. 126-2 at 128 (127:3–10).) Nothing in CitiMortgage's transaction history, system notes, or loan documents, including the promissory note, "indicate[d] to Citi[Mortgage] that Mr. Gross's debt had been cancelled or discharged or anything like that." (Doc. 126-2 at 128 (127:11–19).)

Specifically in response to Gross' May disputes, CitiMortgage investigated the question of whether Gross owed money on the loans by looking for a signed note and, after finding a signed note and "no other documents that showed [Gross] didn't owe" the debt, "relied on the transaction history" and the system notes to conclude the reporting was accurate. (Doc. 126-2 at 129–133 (128:1–132:17).)

On July 3, 2018, Gross filed suit against CitiMortgage, Equifax, Experian, TransUnion, and CitiBank NA, alleging a violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA") in a single count against all named parties. (Doc. 1.) Subsequently, all parties except CitiMortgage were dismissed. (Docs. 48, 63, and 71.) In March 2019, Gross filed the Third Amended Complaint, alleging a general violation of the FCRA and specifically alleging that CitiMortgage "failed to conduct a reasonable investigation following receipt of no less than **three** indirect disputes under 15 U.S.C. § 1681s(2)(b)" and "willfully provided inaccurate information to [the CRAs], despite Arizona's antideficiency statute." (Doc. 68 (emphasis in original).) In other words, Gross alleged CitiMortgage violated the FCRA by continuing to report the debt even though, under Arizona's anti-deficiency statute, the debt had allegedly been extinguished in 2013

1    when the Trustee Sale took place. On December 16, 2019, both parties moved for summary

2    judgment.

3                        **LEGAL STANDARD AND ANALYSIS**

4         "[W]hen simultaneous cross-motions for summary judgment on the same claim are

5    before the court, the court must consider the appropriate evidentiary material identified and

6    submitted in support of both motions, and in opposition to both motions, before ruling on

7    each of them." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132,

8    1134 (9th Cir. 2001). The moving party is entitled to summary judgment if the evidence,

9    viewed in the light most favorable to the non-moving party, shows "there is no genuine

10   dispute as to any material fact" and the moving party "is entitled to judgment as a matter

11   of law." Fed. R. Civ. P. 56(a); *see also Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir.

12   2004); *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998).  The moving party initially

13   bears the burden of proving the absence of a genuine dispute of material fact.  *Celotex*

14   *Corp. v. Catrett*, 477 U.S. 317, 321–25 (1986).  To do so, "[t]he moving party must either

15   produce evidence negating an essential element of the nonmoving party's claim or defense

16   or show that the nonmoving party does not have enough evidence of an essential element

17   to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz*

18   *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the non-

19   moving party to demonstrate the existence of a factual dispute that might affect the

20   outcome of the suit. *Saddiq v. Trinity Servs. Grp.*, 198 F. Supp. 3d 1051, 1055 (D. Ariz.

21   2016).

22        CitiMortgage argues it is entitled to summary judgment on four grounds. First,

23   CitiMortgage's reporting was accurate because the Arizona anti-deficiency statute did not

24   extinguish Gross' debt to CitiMortgage. (Doc. 122 at 4–7.) Second, CitiMortgage had no

25   legal duty under the FCRA to investigate whether the Arizona anti-deficiency statute had

26   extinguished Gross' debt to CitiBank. (Doc. 122 at 7-10.) Third, CitiMortgage's reporting

27   was not misleading in a material sense because CitiMortgage was not required to make any

28   representation about "the remedies available to the creditor to collect the subject debt."

(Doc. 122 at 2, 10-13.) Fourth, even if the credit report was inaccurate or misleading, Gross was not damaged because he "lacks evidence of any economic or emotional harm caused by the alleged violation" and lacks Article III standing to sue for nominal statutory damages. (Doc. 122 at 2, 13-18.)

Gross argues he is entitled to summary judgment on four grounds. First, CitiMortgage violated the FCRA, 15 U.S.C. § 1681s-2(b), by failing to conduct a reasonable investigation. (Doc. 125 at 7-8, 13-17.) Second, CitiMortgage's reporting, including the reporting of a 180-day late $38,000 unpaid balance between August 2013 and April 2018, and the reporting of the account as charged off in April and May 2018, was not accurate because the Arizona anti-deficiency statute abolished Gross' debt to CitiMortgage. (Doc. 125 at 8-10, 12.) Third, CitiMortgage's reporting was misleading because it omitted "salient information about the collectability (or lack thereof) of the debt." (Doc. 125 at 10-12.) Fourth, Gross was damaged economically and emotionally by CitiMortgage's actions. (Doc. 125 at 17-18.)

The parties' motions contain significant overlap, but the threshold issue is whether the facts, viewed in the light most favorable to Gross, create a genuine dispute of material fact regarding CitiMortgage's compliance with the FCRA. They do not. CitiMortgage's motion will be granted, and Gross' motion will be denied.

## I.     The Fair Credit Reporting Act and Arizona's Anti-Deficiency Statutes

The Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x, was enacted in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). To ensure that credit reports are accurate, furnishers, or "sources that provide credit information to CRAs," such as CitiMortgage, have two categories of responsibilities: (1) "to provide accurate information"; and (2) to conduct an investigation when a consumer disputes the information. *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153–54 (9th Cir. 2009) (citing 15 U.S.C. §§ 1681–2(a)(3), 2(b)). Information is inaccurate if it is "patently incorrect" or if it is "misleading in such a way and to such an extent that it can

be expected to adversely affect credit decisions." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010) (quoting *Gorman*, 584 F.3d at 1163); *Kuns v. Ocwen Loan Servicing, LLC*, 611 F. App'x 398, 400 (9th Cir. 2015) (stating information is incomplete or inaccurate if it is "obviously wrong or missing crucial data," or if it is "materially misleading").

Gross' claims that CitiMortgage's reporting was inaccurate or misleading, and the investigation unreasonable, rely on his belief that the debt was abolished by Arizona's anti-deficiency statute, A.R.S. § 33-814.[5] The parties do not dispute that the anti-deficiency statute applies here and agree "no action may be maintained to recover any difference between the amount obtained by sale and the amount of the indebtedness and any interest, costs and expenses." A.R.S. § 33-814(G). This statute "places on the lender, not the borrower, the risk of lending more money than what the residence is worth, or is likely to be worth in the future." *M & I Bank, FSB v. Coughlin*, 805 F. Supp. 2d 858, 864 (D. Ariz. 2011). The Arizona legislature's intention in passing the anti-deficiency statutes (§ 33-729 and § 33-814) in 1971 was "to protect certain homeowners from the financial disaster of losing their homes to foreclosure plus all their other nonexempt property on execution of a judgment for the balance of the purchase price." *Baker v. Gardner*, 770 P.2d 766, 769 (Ariz. 1988) (en banc).

The Arizona Supreme Court directly addressed the question of what happens when "sold-out junior lienholders . . . attempt[] to bring an action on the debt." *Baker*, 770 P.2d at 771. In reaching the answer, the Arizona Supreme Court "endeavor[ed] to effect th[e] purpose" of discouraging unsound land sales due to overvalued land, and preventing the aggravation of an economic downturn (if land values dropped) "'that would result if defaulting purchasers lost the land and were also burdened with personal liability.'" *Id.*

---

[5] Arizona has two anti-deficiency statutes, A.R.S. § 33-729, which applies to purchase money mortgages, and A.R.S. § 33-814, which applies to deeds of trust. Although TransUnion transmitted an ACDV to CitiMortgage with a note in the section for "FCRA Relevant Information" reading "House meets the criteria for Arizona anti[-]deficiency statu[t]e[] ARS 33 729," in fact A.R.S. § 33-814 is the anti-deficiency statute at issue in this case. (Doc. 126 at 4, Doc. 126-6 at 2.)

(quoting *Spangler v. Memel*, 498 P.2d 1055, 1060 (Cal. 1972) (en banc)). The Arizona Supreme Court clearly held "that the legislature's objective in enacting § 33–814([G]) was to abolish the personal liability of those who give trust deeds encumbering properties of two and one-half acres or less and used for single-family or two-family dwellings. . . . [Therefore, t]he holder of the note and security device may not, by waiving the security and bringing an action on the note, hold the maker liable for the entire unpaid balance." *Id.* at 772. Clarifying the scope of its opinion, the Arizona Supreme Court summarized "Where the creditor chooses non-judicial foreclosure, he cannot obtain a deficiency judgment if the collateral is within the class protected by the deed of trust anti-deficiency statute." *Id.* at 775 (supplemental opinion). The Court then addressed "any inequities that *Baker* may visit on some lenders" and concluded that "giving home purchasers the full benefit of legislative protection outweighs the hardships to lenders." *Id.*

Because caselaw interpreting Arizona's anti-deficiency statutes is slim, courts interpreting those statutes may refer to cases interpreting California's anti-deficiency statute, Cal. Code Civ. Proc. § 580b, "'as Arizona has adopted much of its redemption and mortgage statutes' from [California]." *Baker*, 770 P.2d at 770 (quoting *Skousen v. L.J. Development Co., Inc.*, 655 P.2d 1341, 1344 n. 5 (Ariz. Ct. App. 1982)). The purpose of California's "bar on personal recovery" is twofold, and identical to the legislative intent of Arizona's anti-deficiency statute: California's § 580b "protects borrowers from the potential of losing the property and still owing more (which is likely to be the case during the economic downturns when foreclosures are more common); and it protects the real estate market by encouraging lenders to properly value property (because lenders will lose out if they make loans on overvalued property)." *Alborzian v. JPMorgan Chase Bank, N.A.*, 185 Cal. Rptr. 3d 84, 90 (Cal. Ct. App. 2015). But the "absence of personal liability is not equivalent to the absence of debt." *Herrera v. LCS Fin. Servs. Corp.*, No. C09-02843 TEH, 2009 WL 2912517, at *7 (N.D. Cal. Sept. 9, 2009). California's anti-deficiency statute as of 2013, the date of the Trustee Sale—and, by extension, Arizona's anti-deficiency statute—"do[es] not even purport to wipe out the debt, but only to apply in the contingency

that a deficiency judgment is sought," which differs from other states where the debt is extinguished. *Mortg. Guarantee Co. v. Sampsell*, 124 P.2d 353, 355 (Cal. Ct. App. 1942) (distinguishing California's statute from New York's statute, which provides that "the proceeds of the sale regardless of amount shall be deemed to be in full satisfaction of the mortgage debt" (quoting N.Y. Civil Practice Act § 1083-a (renumbered at N.Y. Real Prop. Acts. Law § 1371(3))).  In short, California courts determined "that the sale of the real property under the deed of trust does not wipe out the indebtedness." *Id.*; *see Thoryk v. San Diego Gas & Elec. Co.*, 170 Cal. Rptr. 3d 309, 318 (Ct. App. 2014) (same); *see also Johnson v. Wells Fargo Home Mortg., Inc.*, No. EDCV 13-01044-VAP, 2013 WL 7211905, at *6 (C.D. Cal. Sept. 13, 2013) ("[T]o preclude reporting of a deficiency may be at odds with the purpose of a credit report, which is to provide accurate credit information to potential creditors," because even if a deficiency is not collectible "'it does show that the debtor did not fully pay the balance due on his debt.'") (quoting *Abdelfattah v. Carrington Mortg. Servs. LLC*, No. C-12-04656-RMW, 2013 WL 495358, at *2 (N.D. Cal. Feb. 7, 2013)); *Herrera*, 2009 WL 2912517, at *7–*8 (the California anti-deficiency statute "eliminates a creditor's ability to seek a deficiency judgment, but it does not eliminate the underlying debt[, although t]he fact of that debt's existence may be entirely theoretical, given that [the anti-deficiency statute] closes the courthouse door on any creditor's collection efforts against the mortgagor.").

The Arizona Supreme Court "change[d] the Arizona rule [regarding anti-deficiency statutes] to the law of California" in 1988. *Baker*, 770 P.2d at 772. Although California's law has since been amended for the explicit purpose of "clarifying that 'no debt is owed' after non-judicial foreclosure after a purchase money foreclosure, [such] that reporting a deficiency as a debt would violate the law against reporting incomplete or inaccurate information," Arizona's law has *not* been so amended. *Johnson*, 2013 WL 7211905, at *7 (quoting Assembly Floor Analysis on S.B. 426, 2013 S. 2013–14 Sess. (June 19, 2013) (Cal. 2013)). Therefore, Arizona may still look to pre-amendment California caselaw.

Thus in Arizona the anti-deficiency statute "does not, as a technical matter,

extinguish the outstanding debt; it merely extinguishes any ability to collect it." *Hansford v. JPMorgan Chase Bank NA*, No. CV-14-01380-PHX-GMS, 2014 WL 11515621, at *2 (D. Ariz. Dec. 11, 2014); *see also* Black's Law Dictionary 462 (9th Ed. 2009) (defining "debt" as "liability on a claim; a specific sum of money due by agreement or otherwise"). Despite Gross' arguments to the contrary, the Ninth Circuit's unpublished decision in *Kuns* does not foreclose this holding. 611 F. App'x 398.

In that case, the defendant, a loan servicing company, held the purchase money mortgage on the plaintiff's California home, chose to sell the home in a non-judicial foreclosure, then reported the deficiency on the plaintiff's credit report. *Id.* The plaintiff alleged the defendant "report[ed] . . . the deficiency, without being accompanied by additional information to indicate [plaintiff's] lack of personal liability," in violation of California's Consumer Credit Reporting Agencies Act. *Id.* at 399–400. The district court dismissed the case, and the Ninth Circuit reversed. But the procedural posture of a motion for summary judgment is different than the procedural posture of a motion to dismiss, and a plaintiff may adequately state a claim that a furnisher's reporting was incomplete or inaccurate yet fail to raise a genuine dispute of material fact that the reporting was *actually* incomplete or inaccurate. And, as will be discussed *infra*, when a consumer disputes a furnisher's reporting of a debt that is uncollectible, the reporting may nevertheless be accurate so long as the dispute is also reported.

As a matter of law, then, after the 2013 Trustee Sale Gross still owed the debt to CitiMortgage but CitiMortgage could no longer take any action to recover the debt. Having established Gross owed a debt which he had not paid, but which he could never be forced to pay, the question is whether CitiMortgage violated either its responsibility "to provide accurate information" or its responsibility to conduct an investigation after Gross disputed the information. *Gorman*, 584 F.3d at 1153–54. Each responsibility will be addressed in turn.

**A. Accuracy**

A furnisher violates its responsibility to furnish accurate information to the CRAs

1    when it reports information that is "patently incorrect" or "misleading in such a way and
2    to such an extent that it can be expected to adversely affect credit decisions." *Carvalho*,
3    629 F.3d at 890 (quoting *Gorman*, 584 F.3d at 1163). Here, CitiMortgage reported a
4    balance of $38,010 that was over 120 days (or over 180 days, depending on the date of the
5    report) past due each month from August 2013 to March 2018, then a zero balance
6    beginning in April 2018 when the balance was charged off. (Doc. 126 at 4.) CitiMortgage
7    also reported Gross disputed the status of the debt beginning in February 2018. (Doc. 126-
8    6 at 3.)

9        Gross does not dispute he did not fully pay back "the amount of money that was
10   loaned to [him] to purchase the property," stating "I did not repay in dollars." (Doc. 123-4
11   at 108.) That is, he does not dispute that, of the $40,474 he originally borrowed, $38,010
12   dollars were not repaid,[6] nor was Gross' expert able to identify any factual inaccuracies in
13   CitiMortgage's report. (Doc. 123-3 at 29–30 (27:15–28:18), 32–37 (30:15–35:18).) Where
14   "all of the relevant facts [a]re correctly reported" (*i.e.* whether the debt belongs to the
15   consumer, whether "the amount past due is too high or low," or whether "any of the listed
16   dates are wrong"), there is "no *patent* error in [the] credit report." *Carvalho*, 629 F.3d at
17   891 (emphasis in original). CitiMortgage's reporting of the $38,010 balance was therefore
18   "'technically accurate' in the sense that it reflected [Gross'] failure to make . . . payments
19   on the loan." *Gorman*, 584 F.3d at 1163.

20       However, as discussed previously, Arizona's anti-deficiency statute extinguished
21   CitiMortgage's ability to collect the $38,010 balance, and "a consumer report that contains
22   technically accurate information may be deemed 'inaccurate' if the statement is presented
23   in such a way that it creates a misleading impression." *Gorman*, 584 F.3d at 1163 (quoting
24   *Saunders v. Branch Banking And Tr. Co. Of VA*, 526 F.3d 142, 148 (4th Cir. 2008)); *see*
25   *Johnson*, 2013 WL 7211905, at *8 ("[F]ailing to report that a debt is not subject to a
26   deficiency judgment is also potentially misleading."). Specifically, when a consumer

27
28   ───────────────
     [6] "[Gross]: [CitiMortgage] claim[s] that I missed payments, that I still owe money . . .
     Q: You didn't make any of those payments; right? You don't dispute that; right?
     A: Yes." (Doc. 123-4 at 110.)

"fail[s] to pay a debt that is not really due," the furnisher reports the debt, and the consumer then disputes that report, if the furnisher does not report the dispute then "the information [might be] sufficiently misleading so as to be 'incomplete or inaccurate' within the meaning of the" FCRA. *Id.; see Carvalho*, 629 F.3d at 891.[7]

The FCRA imposes a duty "to provide notice of dispute" on a furnisher as follows:

> If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

15 U.S.C. § 1681s-2(a)(3). Under this definition, CitiMortgage's duty to provide notice of the dispute was triggered on February 23, 2018, when Gross sent a written dispute to TransUnion, which was forwarded to CitiMortgage. (Doc. 126 at 4.) And CitiMortgage promptly complied: in addition to the February 23, 2018 response to the TransUnion ACDV that included the code "XB: Account information disputed by consumer under the Fair Credit Reporting Act" in the CCC field, the April 10, 2018 credit report ordered by Starboard Financial as part of the underwriting file for Gross' June 2018 loan includes the comment "Account information disputed by consumer; second mortgage."[8] (Docs. 126-6 at 3, 123-7 at 1, 13.) Gross' expert concedes the "appropriate way to" notate a dispute "is

---

[7] "Black's Law Dictionary defines 'creditworthy' as 'financially sound enough that a lender will extend credit *in the belief default is unlikely*.' Black's Law Dictionary 426 (9th ed. 2009) (emphasis added). Under this definition, a consumer who avails herself of a good or service but defaults on payment would be considered less creditworthy than one who does not, regardless of how legally sound her reasons for default are. That she defaulted is certainly relevant to potential creditors and is precisely the type of information that a credit report is meant to supply." *Carvalho*, 629 F.3d at 891.

[8] Although Gross disputes CitiMortgage's use of the Starboard Financial underwriting file as hearsay, Doc. 131 at 6 ¶¶ 26–27, the file appears to consist of business records that are exempt under Fed. R. Evid. 803(6). (Doc. 123-7 at 2.) VA Form 26-6393, the loan analysis, indicates that the CitiMortgage debt was not considered (there is no checkmark next to it in Section D), and the remarks explain "Borrower had a foreclosure in 2013. . . . Please note the 2nd for that property is continuing to report on borrowers credit but per Arizona state law creditors are not allowed to pursue deficiency judgments for purchase money liens which that 2nd lien was." (Doc. 123-7 at 4.) And the "DU Underwriting Findings," which make the recommendation to refer Gross for a loan, indicate the CitiMortgage debt was "omitted from the underwriting analysis during liability reconciliation." (Doc. 123-7 at 5–6.) The underwriting file also included letters from Gross explaining his dispute with CitiMortgage regarding the debt. (Doc. 123-7 at 10, 12.) As both Gross' and CitiMortgage's experts explain, Starboard Financial's exclusion of the CitiMortgage debt from consideration is the expected result when the "XB" code appears on a credit report. (Docs. 123-3 at 47–49 (45:11–47:21), 123-8 at 12, 15, 18–20.)

- 15 -

with the . . . 'XB Code,' which CitiMortgage . . . did after receiving Plaintiff's February 2018 dispute." (Doc. 126-4 at 24.) The May 25, 2018 credit report Gross requested from Experian includes the comment "Account Information disputed by consumer (Meets requirement of the Fair Credit Reporting Act)." (Doc. 126-3 at 5.) And the June 15, 2018 credit report Gross requested, compiling the results from all three CRAs into one document, includes the comments "Account in dispute-reported by subscriber" (Experian); "Charged off account[,] contact member for status" (Equifax); and "Account information disputed by consumer" (TransUnion). (Doc. 123-2 at 20.)

Gross' remedies were not limited to initiating disputes. As Experian informed Gross in a letter summarizing the dispute results, if the reinvestigation did not "resolve[] [the] dispute," Gross could "add a statement of up to 100 words to [the] report," then "request that Experian send an updated report . . . to companies that have requested [his] credit information as a result of an action [he] took, such as applying for credit, insurance, employment or apartment rental." (Doc. 126-3 at 2.) Such a statement allows "potential creditors [to] have both sides of the story and [to] reach an independent determination of how to treat a specific, disputed account." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 n.23 (11th Cir. 1991). Despite Experian's letter, Gross later testified he was not familiar with this concept. (Doc. 126-1 at 98–99 (97:18–98:20).) Although such a consumer statement may not necessarily "obliterate the stain of a derogatory item on [a] credit report," it provides useful context when the dispute is, at base, a legal rather than factual one. *Carvalho*, 629 F.3d at 892.

CitiMortgage accurately reported the dollar figure of the balance; that the debt belonged to Gross; the dates of the debt; and that Gross disputed the information. Therefore, as a matter of law, CitiMortgage complied with the accuracy requirements of the FCRA in this instance.

### B. Investigation

Once Gross disputed CitiMortgage's reporting, the FCRA imposed a duty to conduct an investigation. 15 U.S.C. § 1681s-2(b)(1). Such an investigation must be non-

cursory and "reasonable in light of what [CitiMortgage] learned about the nature of the dispute from the description in the CRA's notice of dispute." *Gorman*, 584 F.3d at 1157. Although generally courts in the Ninth Circuit may not decide questions of reasonableness on summary judgment, a grant of summary judgment "is appropriate 'when only one conclusion about the conduct's reasonableness is possible.'" *Id.* (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 622 (9th Cir. 1994)). The question presented is therefore whether there is a genuine dispute of material fact regarding the reasonableness of CitiMortgage's investigation in light of the descriptions in the CRAs' notices of dispute. There is not.

Because the scope of the necessary investigation is determined by the "description in the CRA's notice of dispute," the Court repeats those descriptions here. *Gorman*, 584 F.3d at 1157. First, on February 23, 2018, TransUnion transmitted an ACDV to CitiMortgage with the dispute code "112: Consumer states inaccurate information. Provide or confirm complete ID and verify all Account Information" and, in the section for "FCRA Relevant Information," a note reading "House was foreclosed on in 2013[.] House meets the criteria for Arizona anti[-]deficiency statu[t]es ARS 33 729[.] Should not be held liable for debt after foreclosure[.] Times Disputed In Last 120 Days 0[.]" (Doc. 126-6 at 2.) CitiMortgage responded with the response code "24: Consumer's dispute not specific. Consumer Information verified. Account information updated." (Doc. 126-6 at 2.) Second, on May 3, 2018, Gross sent all three CRAs an identical letter "to dispute an error reporting on my credit report," stating he "do[es]n't owe any money on th[e] loan" because CitiMortgage "took over the second mortgage . . . after the house was already foreclosed on," and arguing he "didn't even owe the balance at that time because [he] didn't own the house." (Doc. 123-2 at 92–94.) CitiMortgage was therefore required, under the FCRA, to conduct a reasonable investigation into the accuracy of Gross' account information, including whether he owed the balance, and was put on notice that Gross was making an argument under the Arizona anti-deficiency statute. [9]

---

[9] Although Gross' expert appears to opine that CitiMortgage should have conducted an investigation after Gross' November 3, 2017 phone call to CitiMortgage, Doc. 126-4 at 24,

1   In the course of its investigation, CitiMortgage looked at the transaction history,

2   prior case notes, and system notes; reviewed the original promissory note and confirmed

3   Gross had signed for the debt; compared the name on the promissory notes to the name in

4   the system; and compared the promissory note to the original loan amount. (Doc. 126-2 at

5   96–98 (95:22–97:8), 127–128 (126:5–127:2).) Nothing in CitiMortgage's transaction

6   history, system notes, or loan documents, including the promissory note, "indicate[d] to

7   Citi[Mortgage] that Mr. Gross's debt had been cancelled or discharged or anything like

8   that." (Doc. 126-2 at 128 (127:11–19).) Arizona's anti-deficiency statute renders a debt

9   uncollectible, but does not extinguish the debt, and because CitiMortgage confirmed the

10   "relevant facts," including that the debt belonged to Gross, "the amount past due [was not]

11   too high or low," and none "of the listed dates [we]re wrong," CitiMortgage conducted a

12   reasonable investigation into the patent accuracy of Gross' debt. *Carvalho*, 629 F.3d at

13   891.

14   The final question is whether, after receiving notice Gross was challenging the debt

15   under the anti-deficiency statute, CitiMortgage was obligated to investigate the application

16   of Arizona's anti-deficiency statute, and report to the CRAs that the debt was uncollectible.

17   It was not. The question of whether the Arizona anti-deficiency statute rendered Gross'

18   debt uncollectible is a legal question, not a factual one, and the FCRA does not impose on

19   furnishers a duty to investigate legal disputes, only factual inaccuracies. *See Chiang v.*

20   *Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010) (holding plaintiffs suing

21   furnishers for violating the FCRA by conducting inadequate investigation are required to

22   show "factual inaccuracy, rather than the existence of disputed legal questions," because

---

23   Gross does not have the right to bring a private action on that claim. *Gorman*, 584 F.3d at
1154 ("These duties arise only after the furnisher receives notice of dispute from a CRA;
notice of a dispute received directly from the consumer does not trigger furnishers' duties
24   under subsection (b)."); *see also Seamans v. Temple Univ.*, 744 F.3d 853, 867 n.11 (3d Cir.
2014) ("[B]efore a consumer can bring a private claim against a furnisher for failure to
25   provide accurate information to CRAs, he must first notify the CRA, who then notifies the
furnisher and thereby triggers the furnisher's duty to undertake a reasonable investigation
26   and corrective measures if warranted."); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611,
615 (6th Cir. 2012) ("§ 1681s–2(c) expressly precludes consumers from enforcing the
27   requirement that furnishers, under § 1681s–2(a), initially provide complete and accurate
consumer information to a CRA."). Gross' claim is therefore limited to CitiMortgage's
28   actions on and after February 23, 2018, when Gross first filed a formal dispute with a CRA.

"furnishers are 'neither qualified nor obligated to resolve' matters that 'turn[] on questions that can only be resolved by a court of law.'") (quoting *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68 (1st Cir. 2008)). Gross' expert agrees: when asked if CitiMortgage "had an obligation to . . . perform a legal analysis, to consult with lawyers in Arizona to determine the legal effect of the anti-deficiency statute, and then make a legal determination that . . . Gross no longer owed anything," the expert responded "No, I don't believe I'm offering opinion that they needed to go that far." (Doc. 123-3 at 22 (20:3–13).)[10]

Although CitiMortgage was not obligated to reach a legal conclusion regarding the applicability of the Arizona anti-deficiency statute, because Gross raised "a bona fide dispute, a dispute that could materially alter how the reported debt is understood" CitiMortgage was nevertheless required to report the dispute. *Gorman*, 584 F.3d at 1163–64 ("A disputed credit file that lacks a notation of dispute may well be 'incomplete or inaccurate' within the meaning of the FCRA, and the furnisher has a privately enforceable obligation to correct the information after notice."). It did so, as previously discussed. "[T]he requirement that furnishers investigate consumer disputes is procedural. An investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate." *Gorman*, 584 F.3d at 1161. "[A] plaintiff cannot demonstrate that a reasonable investigation would have resulted in the furnisher concluding that the information was inaccurate or incomplete without identifying some facts the furnisher could have uncovered that establish that the reported information was, in fact, inaccurate or incomplete." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018).

In sum, Gross owed CitiMortgage a debt from the time CitiMortgage purchased the promissory note from IndyMac to the time CitiMortgage charged the debt off in 2018. CitiMortgage lost the ability to collect on the debt in 2013 after the Trustee Sale, due to the

---

[10] When asked if his opinions would change "if the court in this case holds that Arizona law did not extinguish a debt after a trustee's sale of the property securing that debt," Gross' expert responded "I would have to go back and reanalyze all the credit reporting to see if it was all accurate and complete." (Doc. 123-3 at 36 (34:12–19).)

protections of Arizona's anti-deficiency statute, but the debt was not extinguished. From 2013 to 2018, CitiMortgage accurately reported the debt. There is no genuine dispute of material fact that when Gross disputed the reporting, CitiMortgage complied with the requirements of the FCRA to conduct a reasonable, non-cursory investigation into the accuracy of the reporting, and to provide notice of the dispute. But CitiMortgage was not obligated to conduct a legal investigation into whether the debt was uncollectible, and did not do so. CitiMortgage is therefore entitled to summary judgment. CitiMortgage's motion for summary judgment will be granted, and Gross' motion for partial summary judgment will be denied.

**II.   Damages**

Because CitiMortgage's motion for summary judgement is granted with respect to all claims, it is not necessary to address claims regarding Gross' lack of damages.

Accordingly,

**IT IS ORDERED** CitiMortgage's Motion to Strike "Plaintiff's Controverting Statement of Facts" (Doc. 133) is **GRANTED IN PART** and **DENIED IN PART**. Paragraphs 45 through 49 of Plaintiff's Controverting Statement of Facts (Doc. 131) shall be **STRICKEN**.

**IT IS FURTHER ORDERED** CitiMortgage's Motion for Summary Judgment (Doc. 122) is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of CitiMortgage and against Gross, and to close the case.

**IT IS FURTHER ORDERED** Gross' Motion for Partial Summary Judgment (Doc. 125) is **DENIED**.

Dated this 7th day of October, 2020.

Honorable Roslyn O. Silver
Senior United States District Judge